19-60245, Houston Aquarium v. Occupational Safety and Health Review Commission. Mr. Sheehy. Good morning, Your Honors. Thank you very much for your consideration of this case on this beautiful campus. As the Court can understand, this case is of critical importance to the scientific diving community and the continued viability of Aquaria across the country. As an overview, the Aquarium is a closed system. The scientists are trying to replicate what Mother Nature does in the real world. The purpose of the Aquarium is to educate students, other scientists, and the public at large about marine life, using live animals in an artificial setting, but trying to replicate that natural environment. The Houston Aquarium has over 200 different species of mammals and animals in the tanks, and the scientists' findings and observations are reported around the country to scientists, students, and the public at large using seminars, using webcasts, and of course visitors who happen to appear at the Aquarium. Every day, the divers conduct what we call feeding and cleaning dives, and the primary issue before the Court is whether such dives are scientific or educational on the one hand, or, as the Secretary wants you to believe, are simply routine maintenance or manual labor. They are one and the other. The exemption is your burden to prove, correct? Yes, Your Honor, I'd like to say that it's not, but it is. It's a mouthful. It is. And it sort of, it just, the word solely keeps repeating. Solely for science, done by scientists whose sole purpose is science. Absolutely. So I think the hard part of the case then is just, isn't it true that when they're cleaning, there's also a mixed value to it, that viewers enhance their entertainment, they can look in better, and once we say that, is it over with? No, Your Honor, it's not, and if you'd like me to deal directly with that issue of the cleaning, obviously because you asked before I get into my other discussions, the Secretary wants you to believe first that essentially the scientists there at the aquarium go out to the drugstore, get some Windex, spray it on the glass, wipe it off, and there you go, you've got a cleaning operation, and that's simply not so, particularly with respect to the glass or to the acrylic. There could be algae on it. They have to decide what could be harmful. But I guess the question I'm asking is, do you even concede there's actually a mixed value, that it does enhance the viewing experience? And if there's a mixed purpose to it, doesn't the text of the regulation say at that point the standards apply, yes or no? No, I do not concede that, and let me go at it two ways. First place, there is, it's not just scientific diving, it's scientific and educational diving, and the glass has to be cleaned so that people there can look in and be educated about what happens inside the aquarium. That is, looking and seeing what all the fish are doing, the different kinds of fish or the different kinds of animals. So because we have that educational part to the scientific diving, I think that answers the question. Now, we also believe, of course, that it's also scientific, but it's not just the people who are coming to the aquarium and looking through the acrylic glass. We have got webcasts that are broadcast to 50,000 or 60,000 children in classrooms across the country, and they have to be able to see what is going on inside the tank. So no, we do not concede that, simply because it allows people to look inside the tank, that that takes it out of the scientific diving area, because... But you acknowledge the event dives, those are governed by the stricter standards. So I guess a little bit of my confusion is if you've got event dives that in the aquarium they do have to comply, and then you have the autopsy dives that are purely scientific, is it simply a question of putting the feeding and cleaning into one bucket or the other? I think that's right. I mean, we know that the mortality dives are considered scientific. The ALJ found that to be so, and the Secretary has not challenged that, which, of course, raises an issue if the Secretary does not challenge that going in and identifying and taking out dead animals so they can be autopsied to find out what the problem was, that's scientific, but going into the tank in order to take care of live fish is not. It makes no sense. If, in fact, the mortality dives are scientific, which they are, the cleaning and feeding dives have to be as well. Now, the event dives, I don't want to say that we concede that the event dives are not scientific. I will agree we did not challenge it. Honestly, Your Honor, it is a closer call, but the number of event dives is very small, and we did not want to divert the attention of the Court and perhaps affect our credibility arguing to you about event dives when it's really the cleaning and feeding dives that are the enormous number of dives that take place at the Aquarium. I appreciate your candor on that point. On the cleaning aspect of the feeding and cleaning dives, is there scientific technical expertise that has to be brought to bear to clean the glass or whatever has to be cleaned? Absolutely, Your Honor. Not only do we have to identify harmful versus helpful algae that might appear on the glass. Now, it's not just the glass. It's throughout the entire tank, keeping in mind that the purpose of the cleaning dive is not to make the tank spick and span. The purpose of the cleaning dive is to try to replicate what the animals see in the real world. If there were no viewers at all, would you still have to do cleaning? Absolutely, because we have the gross in terms of the algae. But there's a second part of it. Not only is it scientific with respect to the actual cleaning process, but the materials that are used in order to clean the glass. Again, it's not Windex. There are different materials that are used that could affect the pH, which is the acid and base level of the tank, the ammonia level within the water that could affect the well-being of the animals. And the information about the cleaning materials that are used at the aquarium are shared with other aquaria around the country. So it is not just the cleaning process itself. But the Commission dove into that, and it's harder to make that claim if the biologists that are doing the cleaning and feeding aren't taking any notes at all. But you don't have to take notes in order to observe and collect data. Well, was there testimony that then they got on the phone and called the other scientists? Or was any of the cleaning and feeding data ever given to this larger scientific community? Yes, there was a discussion about going to seminars and sharing it at seminars. And in fact, this has been kind of lost, and it's partially my fault for not focusing on it more. But the compliance officer pointed out that at the first time that he went to go and inspect the aquarium, which, of course, when he found it was scientific diving, he was handed a study that the aquarium had done about the behavior of fish in the shark tank. So it is scientific work being done, but yes, there is evidence that the scientists at the aquarium go to seminars and share this information. And on the phone with other aquaria around the country. Again, keeping in mind, who are these divers? They all have degrees in biology. They are all scientists. Quite honestly, I didn't realize this before I got into this case. They are all certified by the Professional Association of Underwater Instructors. They're all certified by the National Association of Underwater Instructors. They are all compliant with the American Academy of Underwater Scientists. Remind me, did you argue to the commission as well? No, sir, there was no oral argument. There was no oral argument. No, sir. What's your, from your standpoint, what's the core mistake the majority made? Because they certainly devoted a lot of attention. They knew the record inside and out. And so where, well, you look skeptically. The opinions are quite developed antagonistically to each other. But I'm guessing, do you see a single thread that you think was the flaw of the majority? Or are they just approaching science at a meta level differently? I do not mean any disrespect to the commission, and I did not mean to indicate that with perhaps my body language there a moment ago. I think the commission ignored the evidence in the record. And to me, the most telling thing that the commission wrote was, and let me make sure I get this right, nothing about the feeding or cleaning dives involves investigation or study done in furtherance of a body of knowledge. How on earth the commission could have made that statement or reached that conclusion to us is just beyond belief. I was struck by some of the language the commission used, for example, and I don't remember whether it's in the brief or the opinion, but in effect belittling the fact that to get to the shark tank, you have to take the shark train or something, as if this isn't really a scientific area. This is to raise money. I mean, this is a commercial activity, isn't it? Yes, sir, it is. And so the fact that it's a commercial activity, and again, you have these event dives where they have, will you, whatever the puns are that you all use. But it seemed that there was this, I'm not going to say animosity, but it seemed the fact that it is a commercial activity seemed to be used against you because you're not a pure science lab. I agree with you, and let me suggest, I've never been there, but my suspicion is that the Large Hadron Collider out in Geneva where they smash protons and other subatomic particles together, my guess is that they have a restaurant, and my guess is that they have a gift shop where you can buy a T-shirt that's got an atom on it or protons colliding, whatever it may be. Does that mean that the scientists who are doing the work are not doing scientific testing? The answer is no. And in this case, the focus has to be on the diving, not what else might be done within the facility, but more simply, and this is probably where I should have started it, is that at the beginning when the regulations were being discussed, there was an argument or a request that the secretary limit the scientific diving to non-profit organizations, and he rejected that and said no, it can be both a profit and a non-profit organization, recognizing that there may be a commercial aspect of it. Frankly, Your Honor, I don't know whether the aquarium aspect of the Houston Aquarium facility makes money. My guess is it probably doesn't because of the expense, but that's what we're focusing on. We're focusing on the scientists doing scientific tasks and reporting those scientific results to the scientific marine diving community across the United States and around the world. Is there any record evidence? I doubt there is, so don't speak outside the record as to why it took four years and five months from when the ALJ ruled until the commission's decision was handed down. No, Your Honor, there's not. Of course, I'm not speaking outside the record. I don't think. I have to think. Given the tenor of both the majority and the dissenting opinions, my guess is there was an awful lot of discussion going on among the three members of the commission in order to reach that conclusion. Keep in mind that these regulations were passed almost 40 years ago. It was 30 years before the commission decided to issue its first citation on the commercial diving standards in an aquarium, and that was the Houston Aquarium. It hadn't been done for 30 years. To our knowledge, it hasn't been done since. So we are in a situation where we have a compelling, in our view, a compelling dissent. We have 40 years where only one citation has ever been issued. And that was after the ALJ had ruled it did satisfy the exception, before he came back and looked again. That's right. I said ALJ, I meant Chapman. Right, the compliance officer. And he came and was given all the information that he needed. But keep in mind also two other points that I want to make before I end my direct is, number one, the secretary at the beginning didn't think there was going to be a big problem distinguishing between commercial and scientific diving because of the difference in tasks and the difference in the tools and the difference in the backgrounds of the divers. And he talked about several times, as your honors know from the Federal Register, about the type of work that commercial divers do. I mean, they use pneumatic drills. They use underwater welding equipment. They use explosives. That's not what scientific divers do. Were any of the divers at the aquarium with the heavy diving helmets and the lines, or are they all scuba? It's not scuba exactly. There's a line that comes from the surface down to a positive buckling device on the belt, the weight belt, and then it goes to a mask, not a full mask. And that's one of the things that the commission wants is to put a full mask on. And I'm sorry I have to say this, but in the shark tank, you wear a full mask that has electrical pulses in it, there's a real problem with the sharks reacting to those electrical impulses, which is one of the reasons why the aquarium is very anxious not to have the commercial diving standards apply. Is that specific point made in the record? Yes, sir. It's there. That it aggravates the sharks. That it can affect their behavior. And it was a discussion by the divers, the expert divers, that this could be dangerous for them. I see my time is up, but let me leave you with one quote at this part. The aquarium is an ongoing laboratory experiment, and that is subject to the exemption from commercial diving standards. Thank you, Governor. Thank you very much. Ms. Tryon? May it please the Court, good morning. I'm Amy Tryon on behalf of the Secretary of Labor. This case is about one thing, whether the feeding and cleaning dives performed in the tanks at Houston Aquarium meet the commercial diving standards exemption for scientific diving. Now, there's one word I didn't hear Mr. Sheehy say during his entire time, and that word is research. The standard defines scientific diving. The dives must be a necessary part of a scientific research or educational activity, and they must be done for the sole purpose of performing scientific research tasks. So that's a distinction that the commission made, and it seems subtle, but maybe you're defending it, which is, yes, this involves scientific knowledge, and yes, it involves scientific techniques, but it isn't research. That's how I understood that paragraph of theirs. I think the commission agreed that at least the parts of the dives that relate to care of the animals could be classified as part of the science of animal husbandry, not the cleaning aspects. But because of the way the definition is structured, it's not a totality of the circumstances kind of thing, where does it fall more in the scientific bucket or does it fall more in the commercial bucket? But it sort of is, because if we say they're not scientists here, if they're not doing science, then we are defining them as commercial divers, which seems pretty incongruous. There's no other category they'd be in. Well, unless they qualify as... Am I right? I mean, they're clearly not recreational divers. So if we're to say that your interpretation is correct, that's saying these are commercial divers. Well, I don't think we have to sort of declare that these are commercial divers. What we're declaring is that they don't meet the strictly written statutory definition for the exemption, and therefore they fall under the commercial diving standard. Now, the scope of the commercial diving standard is that it applies to every place of employment within the waters of the United States, comma, or within any state, comma, where diving and related support operations are performed. Now, Houston Aquarium falls within any state. Diving and support operations are performed there. So it is covered by the standard, unless it meets an exemption. And the preamble to the scientific diving exemption, there was some discussion that aquariums were never meant to be covered. The preamble does not support the argument that Houston Aquarium was among those meant to be excluded. First of all, the preamble to the initial rule, the original standard... I'm sorry. Whether it's the preamble or the exemption text itself, if the language were so obvious, you wouldn't think there would never have been application to aquariums ever for decades. So it clearly isn't the pure text argument isn't that compelling if it's never been interpreted that way. Well, I don't think, Your Honor, that it's fair to say it's never been interpreted that way. It is true, as far as we know, that this is the first time that OSHA has cited an aquarium under this standard. Does the record reflect the aquarium has ever been inspected for commercial diving before? Does the record show there's ever even an inspection of that? The record, I believe, doesn't say anything one way or the other about inspections. But this is, as we know, the first citation that we know of under this standard. But OSHA doesn't inspect every workplace in the country. Its resources are far too limited for that. This inspection was made as a result of an employee complaint. That's one way that OSHA initiates inspections if it receives employee complaints, and that's why this was done. I think that it is... I don't mean to interrupt, but does the record reflect the nature of the complaint? What aspect of the diving was it going to? What was the concern? What the record says, or the ALJ's decision described it as, the complainant expressed concern that the dives didn't qualify for the exemption that they were claiming. I don't know what the exact words were that the person made when they called her. It's not specific to there was a concern that there weren't two-way communications or there weren't harnesses or anything? I don't know about that, no. But I think that it is certainly possible that OSHA didn't consider aquariums one way or the other when this standard was promulgated and when the exemption was promulgated. However, they're still covered by the standard because they are a place of employment within any state where diving operations are performed, and they don't meet the exemption. I do want to point out that there is a variance process. The OSHA Act, Section 6D of the OSHA Act, provides that employers can seek a variance from any standard. OSHA has an entire office dedicated to processing variance applications. So if Houston Aquarium believes that this standard endangers its employees somehow and that it can provide alternative safety measures, it can apply for a variance. It hasn't done that. But just the fact that they believe that what they're doing is safe doesn't mean the standard doesn't apply to them. Can I ask you this? Sure. The first part of this, the first sentence, which is the key sentence under the definition of scientific diving, says, diving performed solely as a necessary part of a scientific research or educational activity. And so then we get to the other sentence, which seemed to me to be key to the Commission's decision. That first part of the sentence, do you agree that the diving here is performed solely as a necessary part of a scientific research or educational activity? I don't think the Secretary is willing to concede that, but it's not necessary to conclude. I mean, there is undoubtedly a commercial component to this enterprise. Does it really matter whether it's commercial or not? I don't think so. Yeah, I don't think so. I mean, sure, even if it were. And this sort of closed system argument that Houston Aquarium is making, likening the aquarium to the space station and saying this is all part of an ongoing science thing, I think that it's fair probably to characterize this as all sort of part of the same... I mean, do we even need to? It's clearly an educational activity, wouldn't you say? We don't think so, Your Honor. I mean, the second part of that sentence, and it has to be done, the dives must be... Oh, yeah, yeah, but that's a different thing. I'm just talking about the first sentence seems to me to be pointing generally to the activity in the facility or whatever you want to call it. And it's hard for me to understand how it's not an educational activity. We're not arguing that it is. It's the second part. It's the research, the scientific research tasks. And the commission found that there was no evidence that Houston Aquarium was performing any, conducting any scientific research at all, let alone any that was either done during these feeding and cleaning dives or somehow advanced during the feeding and cleaning dives. The key here is the cleaning alone? Are you willing to agree that if you're running a scientific or educational activity involving marine animals and you're feeding them, then dives in order to feed them have to be part of that research activity, right? I would think so. I mean, the dissent used an example of a scientist, research scientist cleaning her equipment before... That was going to be my next question. Right, or a microscope. You're cleaning your microscope. Does that mean that the thing isn't researched? But that analogy, first of all, assumes that what is being done is research, which we don't, which we don't, not only we don't concede, but the commission found that there was no research. I want to address a couple of the commission's factual findings, which are to be upheld and supported by... Well, I think that maybe that is the crux, and I'm a little still baffled. If I remember, it was footnote 20, where the majority of the commission said, well, doctors are not doing research. And frankly, I stumbled over that and thought, you know, if these species are all in captivity in a highly artificial environment, everything you're doing to keep them alive sounds to me like scientific research, just as everything a doctor does is enhancing the full body of medical research. I don't think the doctor analogy was the most illuminating choice that the commission majority could have made, but I do, I... I don't think that I quite agree with Your Honor's characterization that everything is part of this ongoing scientific research. Science, yes. Scientific research, no. And I do think there's a difference, and the commission, to sort of illuminate their difference, the commission relied on the dictionary definition of research, which is diligent and systematic inquiry into a subject in order to discover or revise facts, theories, et cetera. And using that definition, the commission drew what I think is a really important distinction between research on the one hand, which is a purposeful activity conducted with a specific goal of learning more about a subject, and then on the other hand, activities that happen to advance knowledge on a subject, which can be just about anything. And the commission placed the feeding and cleaning dives in that category. But what about the mortality? I mean, we have a finding that the mortality dives do meet the exemption. So talk about that for a second and why that doesn't create a problem for your position. Sure. The ALJ found that the mortality dives marginally qualified is the term she used, as scientific dives because the employees investigate the cause of death of the animals and perform a necropsy, which I guess is an animal autopsy. There was no record evidence that or whether Houston Aquarium derived any data from those investigations. My point was, I guess, one of my points is that the dives are to retrieve the dead animal. And the dives, they're not doing the necrop, whatever the word you said. They're not doing that. I looked up how to pronounce it before I came here. I did not. But that thing that they're doing, they're not doing that during the dive. They're retrieving the animal that died.  Well, if I could just finish and sort of draw the contrast that I was going to draw. The ALJ assumed that it was likely that they did derive data from these investigations. And in contrast, for the feeding and cleaning dives, the commission found, and just to point out that the commission's factual findings are to be upheld if supported by substantial evidence. The commission found no evidence that Houston Aquarium divers recorded any observations that they made. Now, Houston Aquarium says, well, the commission made up this rule that you have to write things down. But it's not so much that you have to write things down in order for it to be scientific research, as the fact that they didn't write things down is another piece of evidence that what they were doing was not research. The other piece is being that they didn't point to any studies or research projects that they were doing. One former diver testified that the divers didn't collect any data during the dives. And they did not, in fact, produce during the hearing any data that they had collected. Was there any evidence that data was collected during the mortality dives? No. The ALJ assumed that they did, and that contributed to her finding that they marginally qualified. And as similar to how... I mean, I could see how evidence might be... Data might be collected after the mortality dive because you have the dead animal. Right, and I think that's what the ALJ assumed. I don't... It's not... Right, I think that that could be, and that could be fairly attributed to the dive. I don't know that they... Nobody's suggesting that divers have to be down there with some kind of underwater pen writing things down. Okay, yeah, no, I agree with you. That would be silly. But with respect to the feeding, would you agree that in order to know what the proper feeding is, one has to have data with respect to the animals, with respect to all sorts of things? Yes, I would agree with that, yes. You have to have the... You have to have, well, some knowledge. I would say call it knowledge. You have to have knowledge going in in order to know what the animals are supposed to eat, too. But, you know, I mean, without suggesting that there isn't any science going on here, I have to know what, you know, kind of food to feed my dog at home. Does that make it scientific research every time I feed my dog? I don't think so. I mean, what if it was a shark? Well, that's pretty... But I think, and I want to point out also, similar to opposing counsel mentioning that they, you know, sort of made a litigation decision not to appeal on the event dives, the secretary made a litigation decision not to raise on the... You know, it's really the feeding and cleaning dives are what's at issue here. Counsel, the first sentence of the two-sentence exemption we're talking about says, whose sole purpose for diving is to perform scientific research tasks. And then you look at the illustration, which we read the exemption as a whole, scientific diving does not include performing any tasks usually associated with commercial diving, such as heavy objects, inspection, explosions, cutting or welding, use, so on and so forth. So I find it interesting that this first sentence doesn't say whose sole purpose for diving is to perform their scientific research task, or whose sole purpose for diving is to perform scientific research tasks by the divers. And if you read this holistically, their sole purpose for diving is to perform scientific research tasks, meaning they are part of the scientific research, that you have to keep the fish alive for the fish to have research on the fish, et cetera, et cetera. It's just all part of the whole, and I find it so interesting, the illustrations given. When I read these, I think of the old underwater movies I used to watch as a boy with the fellows in the heavy diving suit, you know, fighting off sharks inside an oil tanker that's gone bad. I think we have to read it as a whole. I mean, we certainly support reading the standard as a whole. I think the terms of the exemption are, the definition is narrow enough that you really can't get around that word sole purpose. I think the enumeration of what constitutes these commercial diving tasks, that's probably just sort of a little bit of a redundancy because those are clearly not scientific research. Excuse me, what isn't scientific research? The performing of those commercial tasks listed at the end of the second sentence that Your Honor read. But I also would point out that in the preamble to the exemption rulemaking, OSHA made clear that mixed dives of mixed purpose are not included in the exemption. And the example given was a scientific researcher who was, pardon me, didn't use the word researcher, a scientific diver who was observing animals and also repairing a crack in a pipe. That dive would not qualify. Yeah, well, that's understandable. We don't have that here. Well, respectfully, Your Honor, I think with the cleaning of the tanks, the tank walls, which three Houston Aquarium employees testified that the purpose of cleaning the tank walls was to ensure a better view for the customers. Well, that's scientific research. The customers are part of the research. The customers are there to observe underwater life and be educated. Well, respectfully, Your Honor, looking at the definition of research which involves an intentional inquiry with the goal of gathering information and adding to an organized body of knowledge, answering a question, if you will, I disagree that that's why the customers are there. To parse it out that narrowly, isn't that inconsistent with the OSHA guidelines? I mean, the aquarium meets many of the criteria that are said to distinguish science from commercial. Correct? It's got the diving board. It does, Your Honor. It's not proprietary. Right? The data they have is not proprietary. I believe that was conceded, but that fact I wouldn't want to go to. And there's no doubt that the actual divers are very, very experienced biologists. So why wouldn't we look to the OSHA guidelines and say this sure looks like it's in the science research camp and not in the pipe welding in the North Atlantic Sea? Well, as the commission explained, the guidelines are meant to illuminate the inquiry in close cases. And this isn't a close case because the definition is clearly not met. And so even if Houston Aquarium satisfies all of those additional guidelines, which the commission found it didn't because there's some language in the guidelines about performing scientific tasks that the commission found was not met. But they don't meet the language in the standard itself. Right. The term sole purpose is what is the answer here. And I can't speak to what Mr. Sheehy said about the dangers of sharks being activated by the masks and such. But if that is a legitimate concern, there are two processes, actually. One is the variance process. And the other is that either an individual employer or the industry, because I know the AZA is interested in this case, can petition OSHA for a clarification, for a modification to the ruling. How about going over the, I think there were five charge violations and you found three, you upheld three violations. Go over those two or three. I think that would be illustrative. Pardon me, Your Honor. They related to two-way communication devices, reserve breathing gas, safety harnesses. Reserve what? Reserve breathing gas. Sorry, I stepped away from the microphone. My apologies. Attachment points for umbilical cords and safety harnesses. Those, you know, those. And the safety harness is so somebody can jump in and throw them out of the pool. What's a safety harness function? I'm sorry, Your Honor. I think we have from reading this a lot about the equipment used here. And then I see that some, that one tank is what, 10 feet deep? And one is six feet deep? And it just seems like it's an awful big stretch here. I know one of them is 40 feet deep, the tower tank. But it's like going after gnats. If we were to reverse, what would be the adverse consequences? Where else would it extend to a situation where you think there would be workplace safety concerns? Well, Your Honor, I think that's sort of the problem with the finding for Houston Aquarium here is that they don't meet the plain language of the exemption. I'm asking you to assume that we don't think you're right about that. Their sole purpose is in this captive species maintaining aquarium setting fits scientific exemption. I'm asking you to tell me is that problematic in any other context? Well, sure. I think that there could be that. A ruling like that would open the door for other entities who maybe do offshore diving to sort of fold in some science-related things, some animal observation while they're down there and say, well, it's all part of the same. It's all part of, we're observing these animals to see how they interfere with our underwater rig platforms or I'm revealing my lack of knowledge about offshore drilling, but something like that. We have admiralty cases coming up. To say that it's all part of something and it's... I think that... But you can't tell me some industry that's onshore, clear tanks, where biologists are doing all their work. There's no financial proprietary gain that would be affected. You're jumping right away to offshore oil where they might add a scientist and try to come into a loop. That doesn't seem that credible. Well, maybe I'm not understanding Your Honor's question. I think there certainly could be tank-type situations where scientific research is being performed. I mean, I am not a marine biologist, but I can imagine some kind of tank where something would be still scientific research. I guess maybe another way of asking what Judge Higginson is asking is, are you aware of scientific-type diving in similar scenarios where OSHA has looked at it and said, no, this does meet the exemption? Are you aware of areas like that outside the aquarium context? No, I'm not, Your Honor. I see my time is up. Thank you very much. Thank you. No, there are no safety concerns if the court were to decide in the Houston Aquarium's favor. The court will recall that there... Well, sometimes judges whisper, and what about aquaculture? I mean, no, that's helpful to me. Would the aquaculture industry, onshore, crawfish, whatever, be able to say, well, it's enhancing the full body of science? I don't think so because, again, you do have the soil situation, but the soil issue, I mean, somebody that is growing crawfish and is doing some scientific research, say, but that's not diving. I mean, we're talking about diving into the water. And if I may, one of the important points why the Secretary agreed to have the exemption in the first place is because of the incredible safety record of scientific diving. It is throughout all the Federal Register. The Aquarium, yeah, but I guess it's just important to probe, and I'm not great with hypotheticals, but imagine a university says, we want to restore the coral reef offshore, and we're going to send biologists down to restore the reef. But they're actually out in the wild now. They're out in the full ocean. Would the logic of your theory be that they would not have to comply with these extra safety measures? Not necessarily because, as the dissent pointed out, the chair pointed out, you have to look at the whole context. Focusing on the aquarium versus open water, and I think maybe it was Judge Duncan who said this, or maybe Your Honor did, you have clear water. You have continual visual sight. You have tenders. You know the depth.  Dead animals don't create a problem in the real world in the open water. They do in the aquarium. So looking at it in its entirety and looking at it with respect to the aquarium, which is what, and to aquaria across the country, which is what this case is before the court, no, there aren't any safety concerns should the court decide that the scientific diving exemption applies. And if I may come back to Your Honor about the different citations and just review them very quickly. The first one had to do with a full mask that would allow electrical communication to someone outside the tank. You have continual visual connection in the aquarium because the water's clear and they communicate using hand signals which are well known in the science community. They have clickers or they can tap on the glass. And in fact, these masks, as I mentioned with the sharks, can affect the behavior of the fish. There's no reason to have electronic communications when you can see someone within the tank which you can't see in the open water. The second one was the reserve tank. And as Your Honor's pointed out, these tanks, with the exception of one, are six to 12 feet tall. The easiest way to get out in case of a problem is to shoot to the surface which takes one or two seconds. To change an additional air supply takes longer than that. And not only that, the addition of bulkier equipment does affect the ability of the diver to observe what's going on. Wasn't there an alternative instead of a reserve tank you could have one of those little mouthpiece breathers? Perhaps so, but does that really add anything when the better thing to do, as the divers were saying and the record reflects this, is just shoot to the surface. Somebody who's taller than six feet,  could be above the surface of the water in a six foot tank anyway. And the third point was the harness. Now the secretary says you've got to have this bulky harness inside these small tanks, which of course is going to affect the diver's ability to perform the task when the airline comes from the surface down and as I mentioned, hooks positively into the weight belt and can be pulled up. And that's how the diver gets pulled up if there's a problem. And there's no evidence that that is not effective. In fact, there is evidence that is an effective way of getting people out of the tank if there's a problem. Evidentially, this shows that the secretary never intended to have Aquaria as part of the commercial diving standards. Let me just ask you this before we run out of time. The council for OSHA mentioned a variance process. Could you comment on that? Certainly. Back when the regulations were first discussed, and I'm sure this is in the brief, but it's in the Federal Register, that was exactly the suggestion. Let's have variances. And the scientific diving community addressed the secretary and said, wait, that's going to take a long time and it's going to be very expensive. Because remember, these standards and this exemption not only applies to the Houston Aquarium, but the thousands of Aquaria around the country. And the secretary decided that the variance process was not to be used, that an exemption was better because of the cost and the necessary... Thank you, councilor. Can I please just give you one quote that I'd like... Thank you very much.